# EXHIBIT C

Exhibit A

# Expert Report of Robert Reiter

# Chicoa v. Casas and City Laundromat

I, Robert Reiter, do hereby declare and attest as follows:

1.      I am the principal of Reiter and Reiter Consulting Incorporated.  The firm provides consulting, product development, and business services for companies in the United States, Australia, Europe and the United Kingdom related to the prevention of vehicle incursions into commercial and public areas.  The address of the company is 2725 Clapton Drive, Colorado Springs, Colorado USA 80920.   I have been retained by Counsel for Plaintiff in the above referenced matter as an expert in the areas of vehicle intrusion access control, the prevention of vehicle incursions, and retail and pedestrian safety.    In connection therewith, I have reviewed the case documents which I have relied upon in forming the opinions expressed herein, as well as my training, expertise, research and experience.  The list of all such case documentation is included at the end of this report as an exhibit.

2.      For more than 15 years, I have been involved in the manufacture, specification, testing, selling, and research of bollards and barriers for the safety and security of people, facilities, structures, and public areas.  Bollards are usually steel posts that are vertically embedded in a footing to prevent vehicles from intentionally or accidentally crashing into buildings, property, or pedestrians.  Barriers are usually steel or concrete fabrications that are constructed or installed that run horizontal to the ground with embedded footings or attachments to a floor or other concrete surface to prevent similar types of vehicle incursions.  My clients and employers have included steel manufacturers, security companies, engineering companies,

1

government entities, large energy companies, design professionals, and private parties, among others.

3.      I have designed and tested products for the bollard and barrier industry and I have participated in technical writing and specification promulgation with industry groups that set standards for testing and installation of bollards and barriers for government, public agencies, utilities, private companies, underwriters, and insurers.  I have conducted crash testing of designs for effectiveness as well as observed or reviewed dozens of tests of the designs and products of others in several countries.

4.      Along with Dean Albertson, Ph.D. of the Texas Transportation Institute at Texas A&M University and others at TTI, I have served on the ASTM F12-10 Committee which wrote the ASTM F2656 comprehensive testing standards to replace the U.S. Department of State "K Rating" system for crash worthiness of bollards and barriers to prevent high speed/willful vehicle incursions and other terrorist acts against buildings, facilities, or the public at large.  Such bollards and barriers are used to protect military sites, government buildings, important infrastructure facilities, stadiums and venues, and other high-value targets.

5.      I am currently co-chairman of the working group within the F12-10 committee that successfully wrote the low speed barrier test standard adopted by ASTM in 2014.  I originally proposed the standard to ASTM in 2006.  This test standard is known as F3016-14 "Standard Test Method for Surrogate Testing of Vehicle Impact Protective Devices at Low Speeds." Information on the F3016 test standard is available for public viewing in the magazine Standardization News, which is a publication produced by and for ASTM International: http://www.astmnewsroom.org/default.aspx?pageid=3644  Information on the approved test

standard is also available from Texas A&M University: http://tti.tamu.edu/2014/12/09/tti-plays-essential-role-in-creating-new-safety-standard-to-prevent-storefront-crashes/

6.     I have extensive training in the design, manufacture, installation, and operation of high security bollard and barrier systems such as those deployed to protect nuclear generating facilities, civil infrastructure, industrial installations, courthouses, and other governmental buildings.  I have substantial experience with security and safety protocols for the United States Department of State for their embassies abroad and for U.S. government buildings generally.

7.     My past responsibilities included managing new product development programs for several bollard and barrier manufacturers in the United States, as well as consulting for such companies in the areas of management, production, business development, and marketing.  In the course of those duties, I have met with companies from Canada, the United States, the UK, Europe, Asia, and Australia.  I am familiar with the risk management strategies of a wide variety of private and public companies in these regions, and have had the opportunity to undertake threat assessment, specification, design and manufacturing projects to protect public areas such as shopping malls, hotels, pedestrian malls, parking structures, airports and many other public areas.

8.     Based on my experience, education, and training, I have become an expert in preventing both deliberate vehicle incursions (the use of vehicles to gain entry, car or truck bombings, hostile vehicle pedestrian attacks, ramraids, etc.) and accidental vehicle incursions, where a driver loses control of a vehicle causing it to crash into pedestrian areas, non-vehicle areas in parking lots, mall entrances or storefronts.  I have found as a result of my training, research, and experience that vehicle-into-vehicle and vehicle-into-pedestrian accidents occur as many as 50,000 times each year in parking lots, with up to 60,000 injuries and 500 deaths

resulting, most of which are suffered by pedestrians.  See National Safety Council data:

https://www.ehstoday.com/safety/black-friday-alert-driving-through-parking-lot-still-driving



9.      In addition, pedestrian injury accident in parking lots (storefront crashes) occur in excess of 20,000 times per year in the United States, and each year as many as 500 people are killed and approximately 4,000 people are seriously injured in what are almost always preventable incidents.  See the National Institute of Building Sciences / Whole Building Design Guide:  https://www.wbdg.org/design-objectives/secure-safe

10.     To that end, I have co-founded the Storefront Safety Council in order to bring attention to this pervasive problem, to promote academic and industry focused research into the scope of the problem, to present best practices and solutions, and to educate the public, industry groups, and code enforcement entities about emerging crash test standards and effective and affordable solutions.  Please see http://www.storefrontsafety.org/

11.     As a result of my work in this field, including research on the causes of such accidents, consultations with insurers and risk underwriters, my work with government and civil

authorities, projects undertaken for federal, state, and local municipalities, review of documentation from various court cases, and my own research investigation of reported incidents in the media, I have determined that the problem of pedal error or driver error accidents in parking lots and at retail storefronts, such as in this incident, can reasonably be seen as being a foreseeable event.

12.     As part of my ongoing research into storefront crashes, I collaborated on an article in 2013 called "Parking is a Full Time Job" which was published by the Texas Transportation Institute at Texas A&M University.  This and subsequent articles have utilized the research methodologies, analyses, and reporting protocol developed in cooperation with Texas A&M University.  These same methodologies and data collection methods have been used since 2013 in my own research into crashes occurring in parking lots and at storefronts, as occurred in this case.  This process forms the core of the research of the Storefront Safety Council, which searches out information on vehicle-into-building crashes, limited to commercial or public buildings, transit stops, public areas, and other non-residential structures.  Having gathered anecdotal and media reports, court records, fire department run records, and published studies concerning these incidents, they are then analyzed for details such as cause, age of driver, type of building and other information, and are cross checked for accuracy using court documents and police reports when available.  The information is uploaded to our growing database, from which our statistical results are obtained.

13.     Our work in the gathering of statistics on private property accidents is ongoing and we add 250 to 300 analyzed incidents to our database every month.  Because the gathering of statistics on causes of accidents on private property (such as in this case) is difficult and time consuming, our statistics on driver error and pedal error accidents on private property has been

5

cited by the National Highway Transportation Administration (NHTSA) as being reliable, and by the National Institute of Building Science, Texas A&M, and ASTM International. Reference to our data have been cited in the Federal Register.

14. I have published articles or been interviewed in more than 20 publications and media outlets on the causes, prevention, and frequency of vehicle incursions and storefront and parking lot pedestrian safety issues. My most recent published article appears in the April 2017 edition of Claims Magazine, entitled "KEEP OUT: Vehicle Intrusion Risks Increase." See: http://www.claimsmagdigital.com/claims/april_2017?folio=22&pg=22#pg22

15. I have testified before numerous city and county boards enacting ordinances involving safety barriers, and I testified before the California State Assembly and State Senate in support of safety barrier legislation, which was passed in 2016 and signed into law by Governor Brown. Please see the following online documents on AB2161:

http://asmdc.org/members/a20/news-room/press-releases/bill-to-prevent-storefront-crashes-is-signed-into-law or http://www.storefrontcrashes.com/2016_07_01_archive.html

16. I consult regularly with parking lot designers and parking lot operators for commercial locations. I have consulted with approximately five of the ten largest U.S. mall owners and property REITs with respect to parking lot and pedestrian safety. I have appeared as a panelist on parking lot safety at conferences for the National Parking Association, the International Parking Institute, and the California Public Parking Consultants Association.

17. I am an accredited instructor of an American Institute of Architects Continuing Education System course (Program# TY0807-F) which is a one hour instruction for credit for Architects and Landscape Architects about the use of bollards in parking areas and storefronts and the application of the ASTM F3016 test standard, a standard that I originally proposed and

which I helped to write in my capacity as co-chairman of the ASTM subcommittee. I am an acknowledged expert in the low speed test standard, the many and various types of tested safety barriers, and their use and proper deployment in parking and pedestrian areas.

18.     I am also an accredited instructor for RedVector by Vector Solutions and currently present two one-hour instruction courses for credit, covering the F2656 and F3016 ASTM standards and best practices for the protection of people, pedestrians and property from vehicle intrusions and deliberate vehicle attacks;

"Bollard Boot Camp – How To Protect People and Places From Vehicle Incursions"   see:
https://www.redvector.com/training-for-individuals/course-search/detail/?course=1e0fefcd-554d-414e-86b1-1eccd7076c3d

 "Selection, Specification, and Installation of Safety and Security Bollards and Barriers."  see:
https://www.redvector.com/training-for-individuals/course-search/detail/?course=353dce68-ed07-4f7b-8760-7647d183ed2d

These courses provide continuing education credit for architects, landscape architects, engineers, city planners and safety professionals in the United States, including those in Georgia:

International Facility Management Association - IFMA - Certified Facility Manager (CFM) (General)
American Academy of Environmental Engineers - AAEES - Member (General)
American Hospital Association - AHA - Certified Healthcare Facility Manager (CHFM) (General)
American Institute of Architects - AIA - Architects (Health, Safety & Welfare - AIA Reg RV2341-2021)
Accreditation: AIA Registered Provider J315
American Institute of Certified Planners/American Planning Association - AICP - Certified Planners
(General - 9156018)
American Society of Landscape Architects (LA CES) - ASLA - Member (Health, Safety & Welfare -
Approved LA CES-2020)
Board of Certified Safety Professionals - BCSP - Certification (General)

19.     I am currently tasked with writing a handbook on the protection of people, pedestrians and property as the Technical Contact for an ASTM manual currently known as WK56283, "New Guide for the Recommendations on the Selection, Specification, and Installation of Safety Barriers and Bollards."   Please see:

https://www.astm.org/DATABASE.CART/WORKITEMS/WK56283.htm

20.     From 2017 to 2019, I served on the Chain Store Age/SPECS advisory board, contributing my experience and knowledge to U.S. and Canadian retailers and suppliers about trends in parking lot and storefront safety, including major Big Box retailers, large banks, convenience store chains, restaurant chains, national pharmacy chains, dollar stores and department stores.  Please see: https://www.chainstoreage.com/article/chain-store-age-announces-specs01-advisory-board-new-marketing/

21.     In June of 2018 I was the recipient of the Statesman Award from the Security Industry Association in Washington DC for my ongoing work promoting public safety and security for the public in the face of deliberate vehicle attacks in public areas as well as accidental vehicle intrusions such as in parking lots and storefronts.  Please see: https://www.prweb.com/releases/2018/06/prweb15553569.htm

22.     I currently serve as Chairman of the Perimeter Security Subcommittee for the Security Industry Association, focused on meeting the security and safety challenges of intentional or accidental vehicle intrusions into public and pedestrian areas.  Please see: https://www.securityindustry.org/committee/perimeter-security-subcommittee/

23.     This preliminary report reflects my experience, research, training and expertise but does not necessarily contain all of my opinions or conclusion in this matter.  I reserve the right to amend this document as new information or facts become available to me.

24.     In this matter, we have the consequence of the failure of a business owner and commercial property owner to take simple steps to remedy a hazardous condition near the entrance to the City Laundromat.  The existence of this hazard was known or should have been known by owners and management, and there is testimony that this was in fact the case.  We

have sufficient information to express the opinion that this incident occurred in a pedestrian-only area on the sidewalk adjacent to the entrance of laundromat, that an incident such as this one was foreseeable, and that this specific incident was preventable using means and methods both affordable and effective. But for simple steps, no one would have been injured at this property when a vehicle inadvertently struck and pinned a pedestrian seated on a bench near the glass storefront of the City Laundromat in Cumming, Georgia.

25.     The Cumming Police Department issued their report #17-04-0021 on 3 April, 2017. Officers Jimenez and Sgt Reynolds reported that they were dispatched at approximately 7:50 PM to investigate a pedestrian versus auto collision at 322 Veterans Memorial Boulevard in Cumming, which is in a strip mall directly across Veterans Memorial Boulevard from the Cumming Police Department. The street address is that of the City Laundromat Inc.

26.     The injured pedestrian proved to be the plaintiff in this case, identified in the police report as Mr. Christian Adrian Chicoa. Mr. Chicoa was seated on one of four benches placed on the sidewalk outside of the City Laundromat when he was struck by a red 2008 Toyota Tacoma pickup truck driven by Mr. Gabino Riveros-Gerardo. Mr. Chicoa as the only person injured in this accident, which occurred when the driver, Mr. Riveros-Gerardo and his two passengers were preparing to depart the parking space directly in front of the bench where Mr. Chicoa was seated. As shown in security camera footage supplied to me, and as noted in Sgt. Reynolds report, the pickup truck had been backed up into the parking space and as Mr. Riveros-Gerardo was preparing to exit the parking space, he made a pedal misapplication error, and instead of stepping on the brake, his foot pressed hard onto the accelerator, causing the vehicle to accelerate backwards, over the curb, and strike Mr. Chicoa.

9

27.     The police report documents the investigation, the interviews of witnesses and the driver, and the evidence gathered.  There were several individuals who witnessed the incident and called 911, plus the two passengers in the vehicle.  No sign of driver impairment was noted, and no citations issued.

28.     The City Laundromat is located in the commercial strip mall owned by Casas LLC.  The property had been purchased by Casas approximately one year before this incident. The strip mall is of a common design, with storefronts facing the parking lot and two rows of parking parallel to the building frontage, one facing the building abutting the curb and sidewalk, and the other row facing away at the edge of the property, as seen in this overhead view.



29.     The bench where was Mr. Chicoa was seated just a few feet from the entrance to the City Laundromat, in an area on the sidewalk closest to the glass storefront, facing the nose-in parking spaces.  The distance from the curb line to the laundromat was measured  133 inches,

much less than the approximately 208 inch length of the Toyota Tacoma which struck him.  The photos below show the location of the bench and sidewalk in side and straight on views:





30    As can be seen in the side view photo above, the benches have been placed along the outside of the City Laundromat for the use of patrons and invitees to rest and wait and smoke while their laundry is being done.  There is testimony that the benches were set out on the sidewalk by the City Laundromat in approximately 2006 and were under their control.  As can be seen from the straight on view (which is the exact parking space where the red Tacoma was parked and the exact location of the bench where Mr. Chicoa was seated) there is only a curb and a sidewalk separating vehicles from any pedestrian or anyone seated on these benches provided by City Laundromat.  There is no form of vehicle barrier protecting the seated patrons from an oncoming vehicle.

31.    As previously stated, I am an expert in vehicle incursions, and I am an expert in the frequency and causes of accidents where a vehicle strikes a pedestrian or building at commercial locations exactly like this one.  The database of the Storefront Safety Council includes over 20,000 vehicle intrusion accidents from around the United States, and my knowledge of pedestrian safety and the prevention of vehicle incursions in retail environments and parking lots is a specialty.   I have written a number of articles, participated in a number of panels and briefings, and presented on these two topics to dozens of groups of architects, engineers, policy makers, parking lot designers and operators, property and business owners and other audiences in many regions of the United States to educate them about solutions these safety issues.

32.    There was a hazardous condition at this location which stems from two site-specific hazards that combined to significantly and unreasonably increase the level of risk to anyone seated on the benches in front of the City Laundromat.  First, the curb and sidewalk are not in themselves capable of stopping a vehicle that is approaching the storefront.  Should any

12

Case 1:19-cv-00817-DDE   Document 78-3   Filed 10/04/20   Page 14 of 23

vehicle, in the act of parking or unparking, for any reason pass over the curb and the sidewalk, there is no barrier to stop the vehicle from striking the storefront and any pedestrians or patrons it might come into contact with.  Secondly, setting out the benches less than 11 feet from the curb and inviting patrons or pedestrians to linger there places these people at an increased level of risk should a vehicle jump the curb and cross over the pedestrian-only sidewalk.

33.     The Storefront Safety Council has accumulated data on more than 20,000 accidents at commercial and public buildings and parking lots over the years, and we estimate that such vehicle incursions occur as many as 60 times per day, or more than 20,000 such crashes annually.  Our estimate is that as many as 4,000 invitees, employees, and pedestrians are seriously injured each year, with as many as 500 killed.  This data is in addition to the 50,000 parking lot accidents and 60,000 injuries and 500 deaths documented by the National Safety Council.  This incident occurred at a busy laundromat, at a point where parking spaces are pointed directly at the glass storefront and separated from the benches by less than 11 feet of sidewalk.  Reports agree that a driver error took place which resulted in a low-speed vehicle incursion into the pedestrian-only sidewalk area which resulted in the injuries to Mr. Chicoa.

34.     The Storefront Safety Council research shows that more than half of all such vehicle incursion accidents are a result of some sort of driver error/pedal error, which occurred in this incident:



35.     We have found that as many as 47% of all vehicle incursion accidents occur at commercial buildings and retail stores of all types, as occurred in this incident:



36.     Crashes involving vehicles and pedestrians at retail locations and commercial properties are frequent and they are well known to the industry and risk managers.  In 2012 and 2013, Argo Insurance made a point to alert the public to the effect that parking lot incidents just like this one might represent a hazard to patrons and that bollards or other safety barriers are prudent safety additions.  As an added example, AIG has had safety and security devices part of their parking lot checklist since at least 2014, and there have been numerous articles published in real estate, parking, insurance, retail, hospitality and risk management magazines and online resources prior to, at the time of, and after this incident.  These and many other examples of such warnings and advisory messages are a part of my file in this matter.

37.     In the May 2012 Argo Insurance made a point to advise of the risks that vehicles can be to pedestrians and property.  The statement reads in part:

**“Bollards or concrete poles can be placed in front of the parking spaces positioned next to the restaurant to protect the building and your customers.  Bollards are especially important for handicap parking spaces directly in front of the building.  Parking bumpers and curbs will not stop a moving vehicle.  For instance, if a customer is parking in front of the building and accidentally pushed the gas pedal instead of the brake, the vehicle can hop the curb and strike a person or the building.” (full document attached as an exhibit)**

38.     Unfortunately for Mr. Chicoa, no protective measures were taken at this specific area of unreasonable risk.  Photos from the incident scene show that nothing protected the plaintiff against the foreseeable risk of a vehicle failing to stop at the end of the parking space and overrunning the sidewalk and striking him while he was seated on the bench provided for him by City Laundromat.  The photo below shows the bench after the impact from the Tacoma pickup truck, which shows the damage a vehicle can do with less than 11 feet of run.



39.    Proper design of parking lots requires that safety of users be maintained at all

times.  It has been well known that a simple curb or wheel stop is not a vehicle stopping barrier,

and in 2003, some 14 years before this incident, the American Society of Landscape Architects

(ASLA) published "Regulation of Landscape Architecture and the Protection of Public Health,

Safety, and Welfare" which states on Page 25:

> **"Public health and safety concerns in parking lot design include, as a matter of critical importance, the management of vehicle traffic to minimize pedestrian hazards, as well as the safe and effective design of the parking lot details."**

Case 1:19-cv-00817-ODE Document 78-1 Filed 10/04/20 Page 18 of 23

**"A significant number of injuries have been caused where curbs and other barriers have been inadequately designed to prevent cars from striking pedestrians in sidewalks and in other non-vehicular areas."**

40.     Measures to protect against these types of vehicle incursions are simple, effective, and inexpensive.  Safety barriers such as bollards and other fabrications are proven, common, and readily available throughout Georgia.  Any competent architect, engineer, or property manager can determine a product to be used, order it, and employ a contractor to install it.  Such measures are taken every day in the construction industry.

41.     Had either Casas LLC as owner of the property, or City Laundromat as the owner of the business and the entity which placed the benches on the sidewalk, taken the simple precaution of installing some sort of safety barrier or bollard at the curb line at the head of each parking space fronting the four benches, any vehicle pulling into or out of these parking spaces would have hit the safety barrier or bollard and been stopped before crossing the pedestrian-only sidewalk.  Had such a barrier or bollard been present, Mr. Chicoa would not have been injured.  Such bollards are readily available and are affordable and effective.  More than 100 companies in the United States could have provided the bollard and any local contractor or parking lot service company could have installed such devices for approximately $600 per parking space.

42.     Georgia has adopted by reference the International Property Maintenance Code as part of the Official Code of Georgia Annotated  (see**: Ga. Comp. R. & Regs. 110-11-1-.19. and Ga. Comp. R. & Regs. 110-11-1-.32 and O.C.G.A. § 8-2-20  and O.C.G.A. § 8-2-23)**  The IPMC is part of the International Building Code promulgated by the International Code Commission, and it sets outs various rules and mechanisms governing the care and compliance standards for structures in Georgia, including commercial buildings such as the strip mall owned by Casas LLC and the

storefront known as the City Laundromat.  Section 302 includes this provision which sets a standard for property owners and business owners to follow:

**302.3 Sidewalks and driveways.** All sidewalks, walkways, stairs, driveways, parking spaces and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions.

❖ The code official is authorized to require that all sidewalks, walkways, stairs, driveways, parking spaces, etc., are usable and kept in proper repair. Walking surfaces that have deteriorated to a condition that presents a hazard to pedestrians must be repaired or replaced to eliminate the hazard and thus reduce the potential for accidents or injuries.

43.　In this case, the parking space at the location where the Toyota Tacoma pickup was backed in, as well as the portion of the sidewalk where Mr. Chicoa was seated on the bench were not maintained free from hazardous conditions.   The layout of the parking lot provided for vehicles pointed directly at the sidewalk, which placed seated persons such as the plaintiff at an unreasonable extra risk because of the dangers of a pinning accident, as happened to Mr. Chicoa. The nose-in attitude of the parking space aimed the vehicle directly at the pedestrian-only sidewalk and the glass storefront of the City Laundromat.  Vehicles may fail to stop at the end of a parking space for any number of reasons, such as pedal error or medical emergency, driver distraction or mechanical failure.  Failure on the part of Casas LLC and City Laundromat Inc. to protect pedestrians from the foreseeable hazardous condition of a vehicle encroaching on the pedestrian-only sidewalk left Mr. Chicoa unprotected.

44.     Below is a chart which shows vehicle weights and impact speeds and the crash resistance of standard commercially available bollards.  The 2008 Toyota Tacoma four door pickup truck weighed approximately 4,500 LBS at the time that it struck the bench.   This weight is derived from the manufacturer's stated curb weight for the vehicle (3,950 LBS), plus the weight of the driver and two passengers, plus an allowance for the weight of fuel in the tank. Line 11 of the chart shows the weight of the vehicle as 4500 LBS.



Line 18 of the chart shows that the installation of a row of commercially available 6 inch diameter steel bollards, properly anchored in a concrete footing, would have been able to stop the Tacoma even if it was travelling 18 MPH to 22 MPH -- a speed substantially greater than the likely speed of impact in this instance based on less than one vehicle length of run from a standing start, and the vehicle being in reverse gear.

45.     As we have seen, The Storefront Safety Council has data on over 20,000 accidents that have occurred on non-residential commercial and public properties, and the National Safety Council has estimated that there are 50,000 parking lot accidents per year in the United States, with more than 60,000 injuries, of which Mr. Chicoa's was just one.  Commercial parking lots are known to be dangerous places, which any prudent business or property owner is aware of.  In addition to this general knowledge, a prudent property owner in Georgia would know or should know that accidents causing injuries to invitees are common.

46.     Vehicle incursion accidents at laundromats are common in the United States.  I have attached a sample of a preliminary data run of such accidents from our Storefront Safety Council research showing approximately 70 vehicle incursions at locations across the U.S. and Canada over a four to five-year period, including incidents before and since this incident.

47.     Vehicle incursion accidents at commercial properties are very common in Georgia.  I have attached a sample of a preliminary data run of such accidents from our Storefront Safety Council research showing more than 290 vehicle incursions over a four to five-year period, including incidents before and since this incident.

48.     It is my opinion that an incident such as this one was foreseeable at this location, in that a vehicle navigating the parking lot, or in the act of parking or unparking in proximity to

the pedestrian-only sidewalk might fail to stop at the end of the marked space. Such accidents might occur for any number of reasons – driver pedal error, driver medical emergency, driver distraction, driver impairment, vehicle malfunction or a collision between two vehicles in motion. This unnecessarily risky and hazardous area of the parking lot, which pointed vehicles at unprotected pedestrians while moving to or from the laundromat entrance using the provided sidewalk, or while seated at one of the four benches provided which invited patrons and pedestrians to linger, presented a foreseeable and hazardous condition that could result in a pinning accident exactly like the accident that severely injured Mr. Chicoa. Neither the owners of the property, Casas LLC, or the owners of City Laundromat Inc. took their duty of care seriously enough to investigate whether this layout of parking lot and sidewalk might constitute a hazardous condition under Georgia's Official Code Annotated, and to take appropriate and prudent measures to reduce the danger to the public.

49.     It is my opinion that the incident was predictable because of the very frequent parking operations at commercial properties such as in this case; the incidence of parking lot and vehicle-into-building incidents at retail locations nationally, as well as at various commercial sites in Georgia; the lack of signage warning customers seated on any of the four benches of the hazard posed by vehicles pointed directly at pedestrians in the unprotected area; the lack of compliance with the Property Maintenance Code; the failure to account for the many causes of such parking lot accidents; and the failure to address "public health and safety concerns."

50.     This problem of vehicle / pedestrian accidents in parking lots has been well known for many years, and is well documented by insurance, risk management, and business publications and trade associations, as well as publicly accessible new items and articles. Any reasonable and prudent business owner, property owner, or safety manager should reasonably be expected to be

aware of both the obvious life safety issue at this particular area of the property owned by Casas LLC at which City Laundromat Inc. operated its business, and the need to remedy the hazardous condition by deployment of some form of safety barrier or steel bollards as outlined above.

51.     It is my opinion that this incident was preventable because the deficiencies of the parking area could and should have been corrected in any of several ways to eliminate the hazard of cars encroaching on the pedestrian-only sidewalk.  The lack of a safety barrier or bollard and the dangerous sidewalk layout left pedestrians or anyone seated on the provided benches unprotected should a vehicle for any reason overrun the sidewalk in the area where Mr. Chicoa was struck and pinned.  It was the responsibility of the defendants to protect "public health and safety" and to take note of the explicit ASLA admonition to provide "….**management of vehicle traffic to minimize pedestrian hazards, as well as the safe and effective design of the parking lot details."**  The failure on the part of the defendants to take any prudent steps to address the hazardous condition prior to the date of the injuries to Mr. Chicoa significantly and unreasonably increased the level of risk to pedestrians using the sidewalk or seated on the benches near the entrance to the City Laundromat.

52.     For the reasons listed above, it is my opinion that this incident was foreseeable, predictable, and preventable.  Because of my experience and training in the fields of access control and prevention of vehicle incursions, it is my opinion that a hazardous condition was present at this location.  Pedestrians were exposed to vehicles that were pointed at them while they were on a pedestrian-only sidewalk and/or seated on a bench provided to them, yet were unprotected from possible vehicle collisions.  Any pedestrians seated on the benches were subjected to the danger of a pinning incident should a vehicle roll forward unexpectedly, jump the curb and cross the pedestrian-only sidewalk and make contact with the bench.   Had some sort of safety barrier or

steel bollard been installed, Mr. Chicoa would not have been injured because the intruding vehicle would have been stopped at the end of the marked parking space.

I hold the above opinions to a reasonable scientific certainty in the above referenced fields of access control, the prevention of vehicle incursions, and retail and pedestrian safety.   I reserve the right to amend or supplement this report as more discovery and more evidence is presented.

Executed this day, 31 October, 2019

Robert Reiter